DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from the judgment of the Williams County Court of Common Pleas which granted the motions for summary judgment filed by appellees, Bernie's Electric Sales Service, Inc. ("Bernie's"), Weber Sand Gravel, Inc. ("Weber"), and Pahl's Ready Mix Concrete, Inc. ("Pahl's"). Appellants, Sandra Tipton, individually, and as administratrix of the estate of Curtis Tipton, timely appealed and raise the following assignments of error:
 {¶ 2} "1. Whether the trial court erred to the prejudice of appellant by granting appellee Bernie's Electric Sales and Service, Inc.'s motion for summary judgment.
 {¶ 3} "2. Whether the trial court erred to the prejudice of appellant by granting appellee Weber's Sand and Gravel Inc.'s motion for summary judgment.
 {¶ 4} "3. Whether the trial court erred to the prejudice of appellant by granting appellee Pahl's Ready Mix Concrete Inc.'s motion for summary judgment."
 {¶ 5} This court notes at the outset that in reviewing a motion for summary judgment, we must apply the same standard as the trial court. Lorain Natl. Bank v. Saratoga Apts. (1989), 61 Ohio App.3d 127,129. Summary judgment will be granted when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C).
 {¶ 6} This matter arose as a result of the electrocution and death of Curtis Tipton ("Tipton"), on November 29, 1999. Tipton was an employee of Pahl's, but worked on Weber's dredge on Weber's property. The dredge was housed on Weber's gravel pit and pond and was powered with three electrical power lines that extended from the shore to the dredge house. A portion of the electrical lines ran along some of the dredge's discharge chute. The discharge chute consisted of sections of pipe that were joined together with rubber sleeves. On the date of the incident, Tipton was sent to repair a leak in the discharge chute, in an area where the electrical lines ran above and along the chute.
 {¶ 7} In order to repair the leak, Tipton went out to the location in a metal boat. Tipton was unable to repair the chute on his own and went back to shore to get Christopher Hentzell. Hentzell testified in his deposition that he and Tipton returned to the site of the leak. According to Hentzell, in order to repair the chute, the two sides of the separated pipe had to be pulled together. To do this, chains were wrapped around each pipe and then a "come-along" was attached to the ends of each chain to pull the two sides of the pipe together.
 {¶ 8} Upon arriving at the site of the leak, Hentzell testified that the electrical lines were hanging above the chute as normal and that Tipton warned Hentzell to "be careful because the power was on." According to Hentzell, however, when Tipton attached the "come-along" to the gantry, the gantry bent, causing the electrical wires to sag below the pipes. After joining together the sides of the pipe, Tipton wrapped a chain clamp around the pipe at the location of the rubber sleeve to hold the pipes together. While Tipton was tightening the clamp, he was electrocuted when the chain clamp cut through the insulation of one of the power lines.
 {¶ 9} In appellants' second amended complaint, appellants sued appellees on the basis of negligence, wrongful death, and intentional tort. Specifically, appellants sued Weber on the following bases: (1) for negligently failing to exercise ordinary care in installing, maintaining, and repairing the power lines and electrical equipment located on the premises; (2) for wrongful death; and (3) for intentionally failing to provide Tipton with proper working conditions and safe equipment, for intentionally violating various safety regulations, and for requiring Tipton to be exposed to known dangerous processes, procedures and conditions when it knew that injury to Tipton was substantially certain to occur. Appellants sued Bernie's only on the basis of wrongful death. And, appellants sued Pahl's for wrongful death and on the basis of an employer intentional tort.
 {¶ 10} Weber and Pahl's filed a joint motion for summary judgment, asserting that appellants could not establish an employer intentional tort. Specifically, Weber and Pahl's argued that because Tipton failed to follow an established safety procedure, to wit, turning off the electricity when working near electrical lines, appellants could not establish that Weber and Pahl's were substantially certain that Tipton would be injured when he was sent out to repair the leaking discharge chute. Appellants responded that Weber was not Tipton's employer and, therefore, was liable to Tipton, pursuant to R.C. 4101.11, for failing to furnish Tipton a safe place of employment. Appellants also responded that Pahl's was liable because there was no policy about shutting off the power before working on the chute, Tipton was never trained to shut off the power, and Pahl's knew the electrical system was not designed by an electrician.
 {¶ 11} Bernie's also filed a motion for summary judgment asserting that there was no admissible evidence establishing that Bernie's negligently maintained Weber's electrical system or that any alleged failure proximately caused Tipton's death. Appellants responded that Bernie's failed to run a continuity check on the electrical lines between the dredge and the breaker box and that, had this been done, it would have been discovered that the electrical lines were not properly grounded. Appellants contend that had the electrical wires been properly grounded, Tipton would not have been electrocuted.
 {¶ 12} The trial court granted appellees' motions for summary judgment. With respect to Bernie's, the trial court held that it was not negligent in the installation, repair and/or maintenance of the power line and that Tipton's death was the sole and proximate result of his own conduct. Specifically, the trial court held that Tipton "appreciated the risk of his conduct and assumed it in performing the duties he was conducting when he was electrocuted." With respect to Weber and Pahl's, the trial court held that appellants had failed to establish the elements for an employer intentional tort.
 {¶ 13} In their first assignment of error, appellants argue that the trial court erred in granting Bernie's motion for summary judgment. Specifically, appellants argue that the evidence establishes that Bernie's was hired to conduct the annual testing and certification of the electrical systems at Weber's, as required pursuant to Mine Safety and Health regulations. Appellants further argue that, in conducting the annual testing of the Weber electrical systems, Bernie's failed to check the resistance and continuity of the grounding conductor from the circuit breaker on shore to the dredge. Appellants assert that had a proper ground system been provided, it would have tripped open the breaker and prevented this accident.
 {¶ 14} It is well settled that the elements of an ordinary negligence suit between private parties are (1) the existence of a legal duty, (2) the defendant's breach of that duty, and (3) injury "resulting proximately therefrom." Mussivand v. David (1989), 45 Ohio St.3d 314,318. "`Duty, as used in Ohio tort law, refers to the relationship between the plaintiff and the defendant from which arises an obligation on the part of the defendant to exercise due care toward the plaintiff.'" Wallacev. Ohio Dept. of Commerce, Division of State Fire Marshal (2002),96 Ohio St.3d 266, 2002-Ohio-4210, at ¶ 23, citing, Commerce Industry Ins. Co. v. Toledo (1989), 45 Ohio St.3d 96, 98. According to the Ohio Supreme Court, "the existence of a duty depends upon the foreseeability of harm: if a reasonably prudent person would have anticipated that an injury was likely to result from a particular act, the court could find that the duty element of negligence is satisfied." Id., citing Texler v. D.O. Summers Cleaners Shirt Laundry Co.
(1998), 81 Ohio St.3d 677, 680; Commerce Industry,45 Ohio St.3d at 98; and Menifee at 77.
 {¶ 15} In this case, it is undisputed that Bernie's was hired to certify that the Weber facility was in compliance with all applicable electrical requirements of the Mine Safety and Health Administration regulations. Bernie's, however, failed to test the continuity and resistance between the circuit breaker and the dredge motors, thereby eliminating any opportunity of discovering a malfunction in the electrical grounding system. Despite this failure, Bernie's argues that appellants failed to establish that the alleged breach of duty was the proximate cause of Tipton's death. To the contrary, Bernie's argues that the "facts point solely to Mr. Tipton's own, intervening negligence as the sole proximate cause of his electrocution." Bernie's defense raises the issue of whether Tipton assumed the risk of danger, thereby relieving Bernie's of liability.
 {¶ 16} Assumption of risk falls into three categories, implied, express, and primary. Primary assumption of risk "`is really a principle of no duty, or no negligence, and so denies the existence of any underlying cause of action.'" Gallagher v. Cleveland Browns Football Co.
(1996), 74 Ohio St.3d 427, 441, citing, Prosser Keeton, Law of Torts (5 Ed. 1984) 496-497, Section 68. Whereas, in implied assumption of risk cases, the defendant is found to owe plaintiff a duty; however, because plaintiff knew of the danger involved and intelligently acquiesced to it, plaintiff's claim is barred. Anderson v. Ceccardi
(1983), 6 Ohio St.3d 110, 113. Express assumption of risk arises "where a person expressly contracts with another not to sue for any future injuries which may be caused by that person's negligence." Id. at 114. However, there is no assertion of express assumption of risk in this case.
 {¶ 17} We find that implied, rather than primary, assumption of risk is at issue in this case. Although Tipton was knowingly involved in a dangerous activity by working in a metal boat around water, metal, and electricity, the risk was not so inherent as to be incapable of elimination. See Ferguson v. Cincinnati Gas Electric Co. (1990),69 Ohio App.3d 460, 462. For instance, there is testimony which states that the risk of electrocution could have been eliminated had the wires been properly grounded. As such, we are not faced with an issue of primary assumption of risk.
 {¶ 18} Instead, the issue in this case is whether Tipton impliedly assumed the risk by consenting to or acquiescing in an appreciated, known or obvious risk to his safety. See Collier v. Northland Swim Club
(1987), 35 Ohio App.3d 35, 37, citing, Wever v. Hicks (1967),11 Ohio St.2d 230. Implied assumption of risk and contributory negligence have been merged by statute and are governed by R.C. 2315.19. Anderson, paragraph one of the syllabus. Insofar as R.C. 2315.19 requires apportionment of the relative degrees of fault between plaintiff and defendant, it is generally held that questions concerning implied assumption of risk are for the jury to determine, particularly when there is conflicting evidence as to plaintiff's contributory negligence.Collier at 39. Only in instances where there is no dispute as to any material fact and "the plaintiff's negligence was so extreme as a matter of law that no reasonable person could conclude that plaintiff was entitled to recover" is the granting of summary judgment appropriate. Id.
 {¶ 19} We find that granting Bernie's summary judgment on the basis that Tipton assumed the risk of injury is not appropriate under the facts in this case. Although it is undisputed that Tipton would not have been electrocuted had he turned the power off before attempting to repair the dredge chute, there is also evidence, albeit controverted, that he would not have been electrocuted had the wires been properly grounded. Accordingly, we find that this is a matter for the jury to determine to what extent, if any, either party was negligent. Appellants' first assignment of error is therefore found well-taken.
 {¶ 20} In their second assignment of error, appellants argue that the trial court erred by granting Weber's motion for summary judgment. Specifically, appellants argue that Pahl's, not Weber, was Tipton's employer and, therefore, the trial court erred in granting summary judgment to Weber on the basis of an employer intentional tort. We agree.
 {¶ 21} Section 35, Article II, Ohio Constitution establishes a fund "[f]or the purpose of providing compensation to workmen and their dependents, for death, injuries or occupational disease, occasioned in the course of such workmen's employment * * *." The Constitution provides that "[s]uch compensation shall be in lieu of all other rights to compensation, or damages, for such death, injuries, or occupational disease * * *" to which an employee would otherwise be entitled. In turn, "any employer who pays the premium or compensation provided by law, passed in accordance [with Section 35, Article II, Ohio Constitution], shall not be liable to respond in damages at common law or by statute for such death, injuries or occupational disease." This employer immunity, however, does not apply when an employer intentional tort has occurred within the context of the employer/employee relationship. Blankenship v. Cincinnati Milacron Chemicals, Inc. (1982),69 Ohio St.2d 608, syllabus.
 {¶ 22} In this case, the trial court denied appellants' causes of action against Weber on the basis that appellants failed to establish the elements for an employer intentional tort. It is undisputed, however, that although Tipton operated the dredge on the Weber property, Pahl's, not Weber, payed Tipton. It is further undisputed that Pahl's, not Weber, participated in the Ohio workers' compensation program on behalf of Tipton. To enjoy the immunity from suit that the Ohio Workers' Compensation Act affords, Weber had to actually be participating in the program on Tipton's behalf. See Section 35, Article II, Ohio Constitution. Weber simply was not the participating employer for purposes of workers' compensation. Accordingly, we find that Weber was improperly granted summary judgment on the basis that appellants failed to establish an employer intentional tort against Weber. Having so held, we further find that there remains a pending cause of action against Weber on the basis of negligence that was neither raised in Weber's motion for summary judgment, nor considered by the trial court. Appellants' second assignment of error is therefore found well-taken.
 {¶ 23} In appellants' third assignment of error, appellants argue that the trial court erred in granting Pahl's summary judgment on the basis that appellants failed to establish an employer intentional tort. We disagree.
 {¶ 24} To establish an employment intentional tort, an employee must prove by clear and convincing evidence that the employer deliberately committed all of the elements of an employment intentional tort. R.C. 2745.01(B). An employment intentional tort "means an act committed by an employer in which the employer deliberately and intentionally injures * * * an employee." R.C. 2745.01(D)(1). Accordingly, the focus in Blankenship and its progeny is on the proof required to establish intent for the purpose of showing that an employer committed an intentional tort against its employee. See, e.g., Van Fossenv. Babcock Wilcox Co. (1988), 36 Ohio St.3d 100, 109.
 {¶ 25} In Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115, paragraph one of the syllabus, the Ohio Supreme Court established the following three elements necessary to prove the existence of an employer's intentional tort: "(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task."
 {¶ 26} In setting forth the proof required to establish intent, the Fyffe court held that "mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent." Id. at paragraph two of the syllabus. Rather, it must be shown that the probability of certain consequences is such that the "employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds * * *." Id. Only in these circumstances, will intent be inferred from the employer's knowledge of all the facts and circumstances which create the risk.Emminger v. Motion Savers, Inc. (1990), 60 Ohio App.3d 14, 16.
 {¶ 27} An employer can fail to take corrective action, institute safety measures, or properly warn the employees of the risks involved, and still not be liable for an intentional tort:
 {¶ 28} "There are many acts within the business or manufacturing process which involve the existence of dangers, where management fails to take corrective action, institute safety measures, or properly warn the employees of the risks involved. Such conduct may be characterized as gross negligence or wantonness on the part of the employer. However, in view of the overall purposes of our Workers' Compensation Act, such conduct should not be classified as an `intentional tort' and therefore an exception, under Blankenship or Jones, to the exclusivity of the Act."Van Fossen, 36 Ohio St.3d at 117.
 {¶ 29} Accordingly, to withstand a motion for summary judgment, the injured employee must set forth specific facts that raise a genuine issue of material fact as to each element of the Fyffe three-prong test. See Van Fossen v. Babcock Wilcox Co., 36 Ohio St.3d at paragraph seven of the syllabus. We find that the trial court correctly held that appellants failed to meet their burden in this regard.
 {¶ 30} There is ample testimony establishing that it was a policy on the Weber premises that the electricity must be turned off when a worker is working near electrical wires. Appellants, however, assert that there was no such policy. We find that it is immaterial that the policy was not reduced to writing, or that other employees may have been unclear about it, because there is substantial evidence in the record that demonstrates Tipton knew that he was supposed to turn off the electricity when working near electrical wires. Tipton's knowledge is established through the testimony of his co-workers.
 {¶ 31} Bill Cheesbro, a co-worker, testified that on at least one occasion during a previous season, he and Tipton had done a repair on the dredge near electrical wires and that
 {¶ 32} Tipton had turned off the power before conducting the repairs. Cheesbro, however, also testified that Tipton failed on other occasions to turn off the power when doing repairs. Cheesbro testified that when he confronted Tipton about not turning the power off before doing the repairs, Tipton would just laugh at him and say that Cheesbro "worried too much." Additionally, according to Hentzell, Tipton had trained him to cut the power before doing repairs near electrical wires.
 {¶ 33} Moreover, we find it significant that, on the date of the incident, Tipton knew that power lines were nearby and that they posed a risk, because he cautioned Hentzell regarding their presence. Finally, we note that there is not one scintilla of evidence that Pahl's ever required Tipton to leave the power on when working around electrical lines.
 {¶ 34} As was the case in Sanek v. Duracote Corp. (1989),43 Ohio St.3d 169, Pahl's could hardly be expected to have anticipated the actions of Tipton which led to his injury. Tipton blatantly disregarded an obvious risk, which he knew existed, and disregarded an existing policy and procedure guarding against such a risk. Accordingly, in weighing the evidence in a light most favorable to appellants, we find that there are no genuine issues of material fact, and that reasonable minds can only conclude that Pahl's is entitled to summary judgment. Appellants' third assignment of error is therefore found not well-taken.
 {¶ 35} In accordance with this decision, the court finds that the judgment of the Williams County Court of Common Pleas is reversed, in part, and affirmed, in part. This matter is remanded to the trial court for further proceedings. Costs of this appeal are to be divided equally between appellants, Weber, and Bernie's.
Judgment reversed, in part, and affirmed, in part.
Peter M. Handwork, P.J., and George M. Glasser, J. concur.
Judge George M. Glasser, retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.